## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL DOCKET NO. 18-99 |
| v. | * | SECTION: "B" |
| JEFFREY DUNLAP | * | |
| | *      *      * | |

### FACTUAL BASIS

The defendant, **JEFFREY DUNLAP** (hereinafter "**DUNLAP**"), has indicated that he intends to plead guilty as charged to Count One, that is, conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349, of the Bill of Information pending against him.

The United States and **DUNLAP** do hereby stipulate and agree that the allegations in the Bill of Information and the following facts are true and correct and that, should this matter have proceeded to trial, the government would have proven them beyond a reasonable doubt, through the introduction of competent testimony and admissible tangible and documentary exhibits. This Factual Basis does not attempt to set forth all of the facts known to the United States or **DUNLAP** at this time. The limited purpose of this Factual Basis is to demonstrate that there exists a sufficient legal basis for **DUNLAP**'s guilty plea. By their signatures below, the parties expressly agree that there is a factual basis supporting the defendant's guilty plea. The parties also agree that this Factual Basis may, but need not, be used by the United States Probation Office and the Court in determining the applicable advisory guideline range under the United States Sentencing Guidelines or the appropriate sentence under 18 U.S.C. § 3553(a).

AUSA

Defendant

Defense Counsel

A.    **FIRST NBC BANK**

1.      At all times material to the Bill of Information, First NBC Bank was a financial institution, as defined in Title 18, U.S.C. § 20, and a member of the Federal Deposit Insurance Corporation ("FDIC") with federally insured deposit accounts.

2.      First NBC Bank was established in or about 2006, with its headquarters in New Orleans, Louisiana, which was within the Eastern District of Louisiana, and branch offices in Louisiana, Mississippi, and Florida.

3.      First NBC Bank was the wholly-owned subsidiary of First NBC Bank Holding Company. Bank President A was a founder of First NBC Bank and acted as its President and Chief Executive Officer from on or about May 2006, until on or about December 2016.

4.      In or around May 2013, First NBC Holding Company became a publicly-traded company listed on the NASDAQ.

5.      On or about April 28, 2017, First NBC Bank was closed by the Louisiana Office of Financial Institutions. The FDIC was named Receiver.

B.    **THE PARTIES AND THE LINE OF CREDIT WITH FIRST NBC BANK**

6.      Company A was a company owned by Bank President A and Business Owner B.

7.      Company A owned approximately 100 acres of land in St. Tammany Parish, Louisiana. Bank President A and Business Owner B planned to develop this property.

8.      Company C owned an interest in a clay pit in St. John the Baptist Parish. Bank President A and Business Owner B jointly owned Company C.

AUSA
Defendant
Defense Counsel

9.      Phoenix Civil Contractors, LLC ("Phoenix")[1] was a construction company located in Slidell, Louisiana, which was within the Eastern District of Louisiana.

10.     The defendant, **DUNLAP**, was a contractor, and an owner and founder of Phoenix.

11.     From in or around approximately March 2009, through April 2017, Phoenix and **DUNLAP** had a banking relationship with First NBC Bank.

12.     From in or around July 2009, through in or around September 2016, Bank President A acted as the loan officer for Phoenix and **DUNLAP**. Bank President A reviewed and approved new loans, lines of credit, and advances or incremental increases for Phoenix and **DUNLAP**. After Bank President A stopped acting as loan officer for **DUNLAP** and Phoenix, he continued to exercise approval authority over their loans and lines of credit through in or around November 2016.

13.     Loan Officer D was a commercial loan officer at First NBC Bank, and was assigned to manage the Phoenix loan relationship in or around September 2016.

14.     Phoenix's largest loan was a revolving line of credit with an account number ending in 9321 ("the LOC"). The LOC was secured, in part, by Phoenix's accounts receivable. First NBC Bank calculated Phoenix's borrowing base[2] on the LOC as eighty-percent of Phoenix's eligible accounts receivable. First NBC Bank policy excluded accounts receivable from the borrowing base where (1) the account debtor is affiliated with the borrower, (2) the

---

[1] The Bill of Information refers to Phoenix Civil Contractors as PCC.
[2] A borrowing base is the amount of money a lender will loan to a company based on the value of the collateral pledged.

AUSA
Defendant
Defense Counsel



services have not been rendered, or (3) the accounts are more than 90 days overdue from the invoice date.

15.    Phoenix and the defendant, **DUNLAP**, had an obligation to provide accurate accounts receivable statements prior to any advances, renewals, or increases on the LOC. When **DUNLAP** and Phoenix submitted financial statements and accounts receivable for Phoenix to support advances, renewals, or increases on the LOC, Bank President A caused these supporting documents to be placed into First NBC Bank's records.

16.    From in or around approximately July 2009, through November 2016, Phoenix listed Company A and Company C on its accounts receivable statements submitted to First NBC Bank, as collateral securing the LOC.

17.    By the time First NBC Bank failed in late April 2017, the balance on the LOC was approximately $22 million.

## C.    COUNT 1: CONSPIRACY TO COMMIT BANK FRAUD

18.    From in or around July 2009, through in and around December 2016, in the Eastern District of Louisiana and elsewhere, the defendant, **DUNLAP**, and others known and unknown, did knowingly and willfully combine, conspire, confederate, and agree to commit offenses against the United States of America, that is: to knowingly, and with intent to defraud, execute and attempt to execute a scheme and artifice to defraud First NBC Bank, a financial institution, and to obtain any of the moneys, funds, credits, and assets, owned by and under the custody or control of First NBC Bank, by means of false and fraudulent pretenses, representations, and promises, relating to a material fact.

AUSA
Defendant
Defense Counsel

19.     The purpose of the conspiracy was for the defendant, **DUNLAP**, Bank President A, and others to unjustly enrich themselves, disguise the true financial status of Phoenix, and conceal the accurate performance of the LOC. The defendant, **DUNLAP**, Bank President A, and others sought to fraudulently obtain money from First NBC Bank, in part, to allow Bank President A and Business Owner B to use Phoenix on projects involving Company A. As a result, Bank President A and Business Owner B would not have to use their own funds to pay Phoenix for work involving Company A.

20.     Specifically, the defendant, **DUNLAP**, Bank President A, and others provided First NBC Bank with materially false and fraudulent documents and financial statements, which, among other things, overstated the value of Phoenix's accounts receivable. The materially false and fraudulent financial statements, accounts receivable, and other documents disguised Phoenix's true financial condition from First NBC Bank, bank regulators, investors, and others.

21.     Employees of First NBC Bank would testify that Bank President A and his administrative staff kept a list of problem borrowers who consistently had overdrafts on their deposit accounts. Bank President A, who was the loan officer for these borrowers, directed his administrative staff to monitor their overdrafts on a daily basis. The staff referred to the borrowers by the acronym "D.O.R.K.S.," because each letter represented a different borrower. **DUNLAP** was the "D" in D.O.R.K.S. This daily monitoring ensured that the D.O.R.K.S. were not on the month-end overdraft report to the Board of Directors. Bank President A was the only person who could approve the overdrafts and keep the D.O.R.K.S. from being on the month-end overdraft report. By concealing the D.O.R.K.S.'s overdrafts, Bank President A hid the true status of their loans from the Board, bank regulators, and investors.

AUSA
Defendant
Defense Counsel

22.     In or around March 2009, the defendant, **DUNLAP**, Bank President A, and others agreed that Phoenix would perform construction services for Company A.

23.     In or around July 2009, Bank President A agreed to lend funds to Phoenix through the LOC issued by First NBC Bank.

24.     Between 2009 and November 2016, **DUNLAP** and Bank President A periodically discussed inflating Phoenix's accounts receivable to justify incremental increases in the LOC. In these conversations, Bank President A instructed **DUNLAP** to inflate his accounts receivable in order to increase the borrowing base of the LOC. Bank President A also falsely assured **DUNLAP** that Phoenix's obligations to repay the LOC would be resolved when Company A completed and sold the 100-acre subdivision in St. Tammany Parish at a profit.

25.     Bank President A told **DUNLAP** that **DUNLAP** did not need to age his accounts receivable, meaning he did not need to identify how long the Phoenix accounts had been outstanding. This direction contradicted bank policy and bank documents that **DUNLAP** signed, specifically Business Loan Agreements, which prohibited the bank from relying on accounts receivable to calculate a borrowing base if they had not been paid in full within 90 days. Bank President A also instructed **DUNLAP** that he could list potential work as accounts receivable, as well as potential change orders. **DUNLAP** knew from past practices this was not how to properly and truthfully list accounts receivables, but agreed to followed the instructions of Bank President A because of his authority and position at First NBC Bank, and because **DUNLAP** wanted to continue having his LOC funded.

26.     Bank President A further told **DUNLAP** that he could write checks from his Phoenix deposit account and would not have to pay overdraft fees. Bank President A explained

Page **6** of **10**

AUSA
Defendant
Defense Counsel

that First NBC Bank would honor those checks even if the checks caused an overdraft on Phoenix's deposit account. Bank records from the Phoenix deposit account corroborate that FNBC Bank did fund repeated overdrafts.

27.     For example, from July 7, 2009 to December 19, 2016, First NBC Bank reversed overdraft charges in Phoenix's demand deposit account ending in 0299 on 7,873 occasions, totaling approximately $256,222.

28.     On or about January 31, 2012, for the purposes of fraudulently securing an advance on the LOC, **DUNLAP** emailed Bank President A's assistant "Up to date receivables" for Phoenix totaling approximately $5.7 million. The list of accounts receivable included false and inflated values. The list also included amounts owed by Company A and Company C to Phoenix.

29.     Less than three hours later, at the direction of Bank President A, **DUNLAP** revised the receivables list to falsely increase Phoenix's accounts receivable by approximately $559,000. **DUNLAP** then emailed the inflated list to Bank President A's assistant. That same day, Bank President A, knowing that accounts receivable on the list were inflated, approved a Loan Advance Request on the LOC, causing First NBC Bank to deposit approximately $175,160 in proceeds into Phoenix's demand deposit account at First NBC Bank.

30.     On or about June 26, 2015, for the purposes of fraudulently receiving an advance on the LOC, **DUNLAP** sent a list of receivables by email to Bank President A's assistant. The list of accounts receivable included false and inflated values. The list also included amounts owed by Company A to Phoenix.

31.     On or about June 29, 2015, at the direction of Bank President A, **DUNLAP** sent a revised list of receivables to Bank President A's assistant. The receivables reported in this list were

AUSA

Defendant

Defense Counsel

falsely inflated by approximately $830,000. On or about June 30, 2015, Bank President A, knowing the receivables were false, approved the advance on the LOC, causing First NBC Bank to deposit approximately $804,000 in loan proceeds into Phoenix's deposit account at First NBC Bank.

32.     In or around July 2015, **DUNLAP**, Business Owner B, and Individual T met at a restaurant in Metairie, Louisiana for lunch. During this meeting Business Owner B asked **DUNLAP** to pay Individual T's company for business expenses related to work for Company A's 100-acre project in St. Tammany. **DUNLAP** immediately wrote a check to Individual T's company for approximately $56,000 for the project. On the same date **DUNLAP** wrote the check, his Phoenix deposit account was overdrawn by more than $200,000. Bank President A approved the overdraft, which directly benefited Company A's project, which benefitted Bank President A, as part-owner of Company A.

33.     On or about January 27, 2016, **DUNLAP** submitted a false and fraudulent financial statement and an inflated list of accounts receivable to First NBC Bank in order to fraudulently induce First NBC Bank to increase the LOC by approximately $1 million. On or about January 27, 2016, Bank President A approved a $1 million increase in the LOC, when he was fully aware the Phoenix financial statement and the accounts receivable supporting the increase were false.

34.     Between on or about January 29, 2016 and on or about February 19, 2016, First NBC Bank deposited approximately $1,038,000 in Phoenix's deposit account at First NBC Bank, based in part on the false representations of Phoenix's accounts receivable and financial statement.

35.     In or around November 2016, **DUNLAP** received written notice from First NBC Bank that the new loan officer for the Phoenix LOC was Loan Officer D.

AUSA
Defendant
Defense Counsel

36.     In or around December 2016, Bank President A called **DUNLAP** and stated that he could no longer manage the Phoenix LOC. **DUNLAP** asked for Bank President A's advice. He told Bank President A that since Loan Officer D was managing his account, he was having problems adjusting his accounts receivable for the Phoenix LOC borrowing base. **DUNLAP** said Loan Officer D asked him to provide aged accounts receivables. However, doing so would drastically reduce the borrowing base used to calculate future advances on the Phoenix LOC. According to bank documents, including Business Loan Agreements signed by **DUNLAP**, accounts receivable which had not been paid in full within 90 days could not be used to calculate Phoenix's LOC borrowing base. Bank President A told **DUNLAP** that as long as **DUNLAP** told employees from First NBC that **DUNLAP** and Bank President A had always agreed that Company A would pay Phoenix when the project was completed, Company A's accounts receivable would always remain current. Bank President A stated that if **DUNLAP** wanted the money on the LOC to keep flowing, he would have to do this. However, **DUNLAP** did not follow this instruction from Bank President A when meeting with Loan Officer D.

37.     Based on the false and fraudulent accounts receivable and financial statements caused by **DUNLAP** and Bank President A, by on or about April 28, 2017, First NBC Bank had advanced more than $22 million on the LOC to Phoenix.

38.     **DUNLAP's** bank records would show that **DUNLAP** spent more than $1 million on business expenses and personal items including vacations, and home renovations, and luxury items using funds drawn, in part, from Phoenix's LOC.

AUSA
Defendant
Defense Counsel

39.     Various records, including income tax returns, IRS filing records, bank records, audio and video recordings, and documents and tangible objects would be introduced at trial to prove the facts as set forth above. In addition, the testimony of First NBC Bank employees, law enforcement agents, and other competent witnesses would be introduced at trial to prove the facts set forth above.

40.     The defendant, **DUNLAP,** agrees that the information herein is not all the information known or known to him about his fraudulent conduct, but that facts contained in this Factual Basis are true and correct, and support the offense charged in Count 1 of the Bill of Information.

**APPROVED AND AGREED TO:**

_____          10/17/18
SHARAN E. LIEBERMAN                       _____
MATTHEW R. PAYNE                          Date
NICHOLAS D. MOSES
RYAN MCLAREN
Assistant United States Attorneys

_____          10/17/18
WALTER BECKER                             _____
Attorney for Defendant                    Date

_____          10/17/18
JEFFREY DUNLAP                            _____
Defendant                                 Date